# FRISBIE *v.* COWEN.

---

SURFACE WATERS; DITCHES; DRAINAGE; RAILROADS.

1. A railroad company has no right to concentrate or accumulate surface water in ditches along the tracks or bed of its road and by cutaways or outlets turn it upon the lower adjoining or adjacent lands to the injury of proprietors thereof.
2. In the absence of a prescriptive right of drainage, a railroad company has no right to utilize a depression or gully, not constituting a natural watercourse, in the lower land of an adjoining owner, for the purpose of receiving water from a ditch along its tracks; and such adjoining owner has the right to fill up and level his land; and if, in so doing, it becomes flooded and injured from the flow of water from the ditch, is entitled to recover damages from the railroad company.

No. 1062.   Submitted May 23, 1901.   Decided June 4, 1901.

HEARING on an appeal by the plaintiffs from a judgment of the Supreme Court of the District of Columbia entered upon the verdict of a jury in an action to recover damages

for an alleged wrongful discharge of water on the plaintiffs' land from an artificial ditch draining the defendant's railroad tracks. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Charles A. Keigwin* and *Mr. C. Albert White* for the appellants.

*Mr. G. E. Hamilton* and *Mr. M. J. Colbert* for the appellees:

1. There was no testimony in the case, and there is absolutely no evidence in the record to indicate that anything other than the house was damaged by the flow of surface water. There was no evidence that the natural drain across the lot ever overflowed, and the refusal to charge the jury upon evidence, which the court said was not in the case, was clearly no error. The court would have been in error if it had complied with appellant's request in that behalf. *Bryan* v. *United States,* 1 Black, 140; *W. & G. RR. Co.* v. *Gladmon,* 15 Wall. 401; *Marshall* v. *Haney,* 4 Md. 498; 11 Encyc. of Pl. & Pr. 170. The defendants filed a plea of not guilty, and before the jury could consider the question of damages at all they had first to determine whether or not the defendants were guilty of any negligence which would entitle appellants to a verdict. The jury decided that the defendants were not guilty of negligence, and, therefore, manifestly never reached the point of considering what damages had been suffered by appellants. It is immaterial, therefore, whether the court below was right or wrong in its charge to the jury upon the question of damages. *Manning* v. *The Union Transfer Co.,* 18 D. C. 214; *Herbert* v. *Northampton,* 152 Mass. 266.

2. The court below instructed the jury, substantially, that if the plaintiffs by their own conduct, and without the intervention of any act on the part of the defendants, so graded their lot as to make it a water-shed, and thereby suffer dam-

age, they are responsible for their own loss and cannot charge the defendants. Applying this instruction to the facts in this case it would seem to us that a fairer instruction could not have been given. It expresses in a somewhat changed form the reason underlying the law of contributory negligence, which is recognized and enforced by all the courts in this country.

3. Appellants have entirely misconceived the theory of appellees' defense. It is true that appellees do not claim a grant or prescriptive right entitling them to discharge surface water indirectly upon appellants' property, but on every other question in the case there was direct conflict in the testimony. Appellees denied all responsibility for the water being cast on appellants' property; denied that they had constructed the cutaway ditch leading to appellants' property, and distinctly claimed that the surface water left the railroad drain opposite their lot in its attempt to seek its level, and that it followed a natural drain in reaching their lot and in crossing it to the artificial drain on the opposite side of the lot. The question then arises as to what was the duty of appellees with regard to this surface water. There has been no adjudication in this jurisdiction on this question, and from an examination of the cases collected in the Encyclopædia of Law, vol. 24, p. 907, it would appear that the courts are about equally divided between the civil-law and the common-law rules. The civil-law rule seems to be that where one of contiguous estates is lower than the other, the lower estate must necessarily be subject to the flow of water from the upper one; and the owner of the lower one cannot erect embankments or other structures to stop the flow from the upper estate. Nor can the owner of the upper estate collect the water in one channel, which before flowed in several channels, and discharge it upon the lower estate to its damage.

Under the common-law rule, surface water is treated as a common enemy, to be gotten rid of in the best manner that good husbandry may suggest, and if in the improvement of our property surface water is caused to stand on adjacent lands in unusual quantities, or to pass over it in greater

quantities and in other directions than it was accustomed. to flow, it is *damnum absque injuria.* 24 Encyc. of Law,. 917; *Gannon* v. *Hardagon,* 10 Allen, 106; *Munkres* v. *Kansas City, etc., Railroad Co.,* 72 Mo. 514; *McCormick* v. *Same,* 57 Mo. 433; Dillon on Mun. Corp., Sec. 798; *Pathke* v. *Gardner,* 134 Mass. 14; *Cassidy* v. *Old Colony Railway Co.,* 141 Mass. 174; *Morrissey* v. *Railroad Co.,* 38 Neb.. 406; *Collier* v. *Railroad Co.,* 48 Mo. App. 398; *Railroad. Co.* v. *Riley,* 33 Kans. 374; *Morrison* v. *Railroad Co.,* 67 Me. 355; *Gross* v. *Tompasas,* 74 Tex. 195; *Brown* v. *Railroad Co.,* 55 N. W. Rep. 123, and *Jordan* v. *St. Paul, etc.,. Railroad Co.,* 42 Minn. 172.

We agree with counsel for appellants that the owner of upper lands cannot collect the waters of his estate into a. ditch or drain, and discharge it in a volume on the lower land to its injury, and it is to be noted that the trial justice so charged the jury. The instruction to the jury is in exact accord with the authorities, and stated the law as broadly as. they are entitled to have it stated. Appellees, under the general issue, contradicted each and every material allegation. on the part of the plaintiffs, and under such circumstances it was proper to submit the case to the jury. *Hughes* v. *Anderson,* 68 Ala. 280; *Meixell* v. *Morgan,* 149 Pa. St. 415.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This action was brought by the appellants, Annie T. Frisbie and William B. Frisbie, against the appellees, John K. Cowen and Oscar G. Murray, as receivers of the Baltimore and Ohio Railroad Company, to recover damages for an alleged injury to property occasioned by the wrongful discharge of water from an artificial ditch draining the tracks and roadway of the railroad company.

It is shown, both by allegation and proof, that the appellants owned a piece or lot of ground contiguous to the line of the railroad, and several feet lower than the tracks, and upon which lot there is a house. Many years ago the rail-

road company constructed within the limits of its right of way the ditch in question, which runs parallel with the tracks of the road for a distance of about three-quarters of a mile, is two or three feet deep and three or four feet wide, and not only drains the company's property, but collects the surface water flowing from adjacent lands upon the tracks of the road. In the year 1896 or 1897 this ditch, formerly of smaller dimensions, was enlarged to its present size; and about the same time the company either constructed or enlarged an outlet for it, which outlet runs at a right angle to the general course of the ditch alongside the track, and runs in the direction of the house on the land of the plaintiffs, and extends to the boundary of their lot and there empties its contents upon their land.

The defendants pleaded the general issue of not guilty, and at the trial the plaintiffs gave evidence to show, that in the year 1897, and after the construction or enlargement of the ditch along the track of the road, and the construction or enlargement of the outlet thereof, a great volume of water was discharged from the ditch through the outlet upon the lot of the plaintiffs after every rain, so that the ground was made more wet and muddy than it had theretofore been, and the lower story of the house on the lot was often overflowed to the depth of sixteen or eighteen inches, and other damage was done to the house and the lot. That by reason of the premises the lower floor of the house became uninhabitable, and the house itself was damaged to such an extent that it would cost about $460 to put it in repair. That the plaintiffs had, in or about the month of December, 1898, constructed a dam at the mouth of the outlet, thereby stopping the discharge of water from the ditch, since which time the premises had been uninjured by water.

The defendants then gave evidence to show that the ditch alongside the track of the roadbed had for many years existed upon the company's right of way, and that the servants of the company had always been in the habit of cleaning it out and keeping it open, but that it had not been in recent years enlarged, and that the outlet leading to the plaintiffs' lot

had likewise existed for many years, and had not been enlarged; that the said ditch and the said outlet thereof were so constructed as to discharge the water therein collected into a natural depression or gully, which extended from the mouth of the outlet across the lot of the plaintiffs and emptied into an artificial drain on the opposite side of the lot, through which the water flowing across the lot was carried to a culvert some distance beyond; that when the plaintiffs dammed the outlet of the ditch the water therein overflowed the tracks, and the defendants found it necessary to extend the ditch about 200 yards within their right of way so as to make it discharge into a stream that runs under the tracks; that the ground in the plaintiffs' lot in the years 1892, 1893, 1894 and 1895, had been wet and muddy, but that the house in those years was dry and habitable. That in the year 1896 or 1897, water from the ditch would flow against the house at times of hard rains; but that, in the year 1895 or 1896, the plaintiffs graded their lot so as to make the surface level, and filled up the depression or gully running across it, and that by reason of this change the water coming from the ditch of the railroad company, which had theretofore run across the lot, flowed and spread over the entire lot.

This was in substance the entire evidence as produced plaintiffs and defendants; and upon this evidence the plaintiffs prayed the court to direct the jury, that they must return a verdict for the plaintiffs in such sum as would fairly and fully compensate them for the damage done to their property by the increased flow of water upon their land caused by the ditch upon the land of the railroad company; and in fixing the amount of the verdict for the plaintiffs the jury should allow a sum which would compensate the plaintiffs for the cost of such repair as might be found to have been made necessary by the increased flow of water caused by the ditch on the land of the railroad company, and such additional amount as might be found to be necessary to remedy the damage due to the same cause. This request by the plaintiffs was refused by the court, and to which refusal the plaintiffs excepted.

The court then proceeded to instruct the jury upon the whole case, and after stating the case and the manner of its presentation, among other things, said to the jury: " If, in this case, the plaintiffs have satisfied you by a preponderance of the evidence that the defendants were the owners of this strip of ground on which the railway was built (and I believe as to that there does not seem to be any controversy), and that a ditch was constructed by the railway company along the railway which gathered up water which fell upon the right of way of the railway company, or which may have fallen upon adjoining premises and found its way into this ditch, and that the water ran down to a point opposite to the plaintiffs' land; that they also constructed a cutaway ditch and through that turned a stream of water onto the land of the plaintiffs in such a way as that this water ran down to and onto and into the house and into the basement of it, and thereby injured the house and otherwise injured the plaintiffs, the plaintiffs would be entitled to recover such damages as the evidence may show you they have suffered in consequence of such water coming from a railroad having been turned onto the land of the plaintiffs and onto the house owned and constructed by them."

This part of the instruction, so far as it goes, is right enough, and it has not been excepted to; but the court proceeds, in the next paragraph, to qualify the instruction thus given, by saying to the jury: " But if the water that came from the railroad ditch through the ditch cut at right angles leading onto the land of the plaintiffs came, as the ditch was constructed by the defendants, onto the land of the plaintiffs through this ditch and did not run onto or into the house, but ran across the lot of the plaintiffs, not in any stream which had banks to it and a channel, but over the land, seeping into the soil to some extent, perhaps, and running across it to some extent — if that was the case before the injury to the house, and then the plaintiffs themselves in the management of their property graded it, *no matter for what purpose, if for any legitimate purpose,* and so graded it that it caused the water instead of running over the lot to run

against the house and into the house, and thereby an injury resulted to the house of the plaintiffs, *which is the only injury they complain of* — if that was caused by a disturbance of the surface of their own land by the plaintiffs, and the water which flowed over their lot or seeped into the earth before ran into their house in volume such as to become injurious, and did injure the property, it would be their own loss in that event. The plaintiffs would not be entitled to recover, and the verdict in that event should be for the defendants.

" If you find that the water, as I have already said to you, was caused by the act of the defendants to run through this ditch and into the house without any effort on the part of the plaintiffs which caused it to run into the house, in that event you should find for the plaintiffs; and your verdict should be such damages for injury to the house as you find from the evidence was caused by the water that was so turned from the railroad ditch by the defendants onto the lot and onto and into the house of the plaintiffs."

It is to this qualifying and restrictive part of the general charge of the court, which we have recited, that the plaintiffs excepted. The theory of the instruction appears to be that the defendants had the right to discharge the accumulated water from the artificial ditch through the cutaway into the depression or gully on the plaintiffs' lot, and that the latter filled up the depression and levelled their lot at their own peril of having the lot flooded and their house submerged in water, without the right to question the power of the defendants to discharge the water from the ditch by the outlet or cutaway onto the lot of the plaintiffs. In this we think there was manifest error.

As will be observed from the terms of the instruction given, the learned court below would seem to have been under the impression that the injury to the plaintiffs' house on the lot over which the water was discharged from the ditch was the only injury of which the plaintiffs complained, or for which they could recover. The court seems to have overlooked the extent of the injury complained of in the

declaration, and also the proof that was produced in support of the allegation. The declaration alleges that by reason of the discharge of the water from the said ditch " the plaintiffs' lot was overflowed, drowned, and submerged to a great depth, to wit, to the depth of six feet, and large bodies and quantities of water were collected and accumulated and caused to stand and remain thereon, and to sink into the soil thereof, and the said lot was thereby rendered wet, swampy, unhealthful, and unfit for the uses to which it had been in its natural condition adapted, and the house erected on said lot as aforesaid, and the rooms, walls, floors, timbers and furniture therein were made wet, damp, rotten," etc. The proof as briefly stated in the bill of exception, as to the condition of the lot, is, " that in 1897, and after the construction or enlargement of the ditch, and the enlargement of the outlet thereof, a great volume of water was discharged from the ditch through the outlet upon said lot after every rain, so that the ground was made much wetter and muddier than it had theretofore been, and the lower story of the house was often overflowed to the depth of 16 or 18 inches, and other damage was done to the house and lot." There was not wanting, therefore, either allegation or proof as to injury suffered by the lot apart from the house.

Whatever difference there may be supposed to exist as between the rule of the civil law and that of the common law in regard to the manner of treating surface water naturally flowing from an upper to a lower tenement, such difference can be of no importance in a case like the present. This, as appears from the facts we have stated, is not the case of the natural flow of surface water, arising from natural causes only and flowing without artificial means; but is the case of the gathering and concentration of surface water from an extensive area, into an artificial channel or drain, and discharging it upon the premises of a lower proprietor to his injury. This, according to all principle, is regarded as a wrong for which the law affords a remedy. The principle is settled, both by the English and American decisions, that where the higher owner collects the surface water in one,

body, or sends it down upon the lands of a lower owner in a different manner from that in which it is accustomed to flow, or in a concentrated form, or in unnatural quantities, he is liable for all the damages sustained therefrom by such lower proprietor. The servitude is to have the waters pass over the land in their natural flow, and a discharge of them in any other manner is a violation of the rights of the lower owner. Indeed, it is laid down as text law, "that no one has a right by an artificial structure of any kind upon his own land to cause the water which collects therein to be discharged upon his neighbor's land." This question has been very fully and intelligently treated by Mr. Gould, in his recent work on Waters, at sections 271-2-3, and 292-3, where the authorities are extensively collated. It is by that author said that "An owner of land has no right to rid his land of surface water, or superficially percolating water, by collecting it in an artificial channel and discharging it through or upon the land of an adjoining proprietor." And again, "A railroad corporation has no right, by the erection of embankments, the construction of culverts, or the digging of ditches, to collect and discharge unusual quantities of surface water upon adjoining lands." This principle is so reasonable in itself that it hardly requires authority for its support, and we shall only refer to a few cases that would appear to have special application to the facts of this case.

In a recent case in the Court of Appeal of England, that of *Whalley* v. *Lancashire & Yorkshire RR. Co.,* 13 Q. B. Div. 131, the question has been very fully considered and the principle applied. There, by reason of a very severe rainfall, a quantity of water was accumulated against one of the sides of the defendants' railway embankment to such an extent as to endanger the embankment, and, in order to protect their embankment, the defendants cut trenches in it by which the water flowed through and went ultimately onto the land of the plaintiff, which was on the opposite side of the embankment and at a lower level, and flooded and injured it to a greater extent than it would have done had

the trenches not been cut. In an action for damages for
such injury the jury found that the cutting of the trenches.
was reasonably necessary for the protection of the defend-
ants' property, and that it was not done negligently. But
the court was unanimous in holding that, though the defend-
ants had not brought the water on their land, they had no
right to protect their property by transferring the mischief
from their own land to that of the plaintiff; that they had
no right to sacrifice the property of their neighbor in order
to protect their own, and, therefore, as said by the court,
upon the plainest principle of right and justice, the defend-
ants were liable.

The same principle was in very unqualified terms asserted
and applied by the Court of Common Pleas, in the case of
*Baird* v. *Williamson,* 33 Law J. 101. That was the case of
water pumped from a mine and allowed to escape over land
of a lower proprietor. In that case the defense was that the
water had been discharged from the mine with great care to
avoid damage, but the court held that to be no excuse for
the injury done the plaintiff.

In the American courts the question has been frequently
under consideration, where railroad companies have, by
ditches along their tracks, gathered the surface water, and
by drains turned it off on the lands of adjoining lower pro-
prietors, and the courts have uniformly held, as the English
courts have held, that the railroad companies were liable for
the damage thus produced. In all such cases it has been
held that there was no right, either by the civil or common
law, to concentrate or accumulate the surface water in
ditches along the tracks or bed of the road and by cutaways
or outlets turn it upon the lower adjoining or adjacent lands
to the injury of the proprietors thereof. *Curtis* v. *Eastern.*
*RR. Co.,* 98 Mass. 428; *Springfield, etc., RR. Co.* v. *Henry,.*
44 Ark. 360; *Toledo, etc., RR. Co.* v. *Morrison,* 71 Ill. 616;
*Hogenson* v. *St. Paul, etc., RR. Co.,* 31 Minn. 224; *Mis-*
*souri Pac. RR. Co.* v. *Keys,* 55 Kans. 205; *Mayor* v. *Sikes,.*
94 Ga. 30; *Kansas City RR. Co.* v. *Smith,* 72 Miss. 677;
*Kansas City RR. Co.* v. *Lackey,* 72 Miss. 881; *Waffle* v.

*New York Cent. RR. Co.,* 58 Barb. 413, affirmed in 53 N. Y. 11.

In several of the cases it has been said that surface water is a common enemy that the owner may repel from his premises without incurring liability to his lower adjoining proprietors, but an exception is always recognized to the general rule, and that exception is, that it is not allowable to an upper owner to collect the surface water by means of ditches or drains and discharge it on the premises of a lower owner. If he does so he is liable for all the consequences.

It would seem from the part of the instruction of the court given, and to which exception was taken, that the case was submitted to the jury on the single question, whether there was damage done to the house of the plaintiffs, and whether that damage was the result of the grading of the lot by the plaintiffs, thereby disturbing what was supposed to be a lawful right of drainage by the defendants of the artificial ditch along the railroad track. But there is no question of prescription raised and relied upon by the defendants as giving them the right of drainage through the lot of the plaintiffs; and it is conceded on all sides, both by court and counsel, that the depression or gully, as it is called, in the lot of the plaintiffs was not a natural watercourse. The defendants had no right to utilize the depression or gully in the lot of the plaintiffs for the purpose of receiving the water from the ditch along the railroad tracks; and the plaintiffs had a perfect right, in the absence of a prescriptive right of drainage by the defendants, to fill up and level their lot to suit their own purposes. As to what will constitute a natural watercourse into which a party may be entitled to discharge the gathered or accumulated waters from an artificial drain, see the case of *Gibbs* v. *Williams,* 25 Kans. 210. The owners of the lot with such a depression in it were under no legal obligation to receive the flow of water that was turned into it, and they were at liberty to fill up the depression whenever it suited their purpose. *Ib.* See also the case of *Hogenson* v. *St. Paul, etc., RR. Co.,* 31 Minn. 224.

In the case of *Beard* v. *Murphy,* 37 Vt. 99, a question was presented very similar to that presented in the present case. In that case it was held that a lower owner was justified in making embankments or other obstruction to the flow of surface water over his land, if the upper owner persisted in discharging other water from his land than the natural surface water that arose thereon and which ran upon the lower owner's land, even though the upper owner suffered great damage in consequence of such embankment. The court held that the servitude only existed as to water arising from natural causes on such upper land, and if the owner of such higher ground discharged other waters over the lower land, it was a nuisance, and, therefore, actionable and abatable by the person injured.

In the present case, the plaintiffs, in the latter part of the year 1898, did construct a dam across the mouth of the outlet from the ditch, and thereby stopped the discharge of the water on their lot, and it does not appear that the defendants made any objection to such assertion and exercise of right by the plaintiffs. On the contrary, finding it necessary for the protection of their tracks, they extended the ditch about 200 yards within their right of way, so as to make it discharge the water therefrom into a stream that ran under the tracks.

Without deeming it necessary to decide whether the first prayer offered by the plaintiffs, requiring the verdict to be rendered for the plaintiffs, was not too general, and, therefore, properly rejected, we shall, for the reasons stated, reverse the judgment below for errors in the general charge to the jury; and it is so ordered.

*Judgment reversed and cause remanded.*