**WOODSMITH PUBLISHING CO., Appellant,**

v.

**MEREDITH CORPORATION, Appellee.**

No. 89–2286.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1990.

Decided June 1, 1990.

William B. Serangeli, Des Moines, Iowa, for appellant.

Jon O. Nelson, Chicago, Ill., for appellee.

Before WOLLMAN and MAGILL, Circuit Judges, and BOGUE,* Senior District Judge.

MAGILL, Circuit Judge.

This case involves a trade dress infringement claim under section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a) (1946). Both parties published nationally competing bimonthly magazines for the woodworking hobbyist and used advertising mailers to solicit subscriptions. The issue on appeal is whether the trial court[1] erred in granting defendant's motion for summary judgment upon plaintiff's failure to raise a genuine issue of material fact regarding likelihood of confusion. We affirm.

## I.

*Woodsmith,* a magazine published bimonthly by Woodsmith Publishing Company (Woodsmith), attempts to instruct woodworking hobbyists on complex techniques and skills. Woodsmith was the sole proprietorship of Donald B. Peschke, a former Meredith Corporation (Meredith) employee. *Woodsmith* included instructions on how to build complex projects in an easy-to-follow manner using step-by-step drawings. Woodsmith's magazine cover layout, with masthead and banner across the cover, standardized type style for article titles, and a large, framed photograph of one of

* THE HONORABLE ANDREW W. BOGUE, Senior United States District Judge for the District of South Dakota, sitting by designation.

1. The Honorable Harold D. Vietor, Chief Judge, United States District Court for the Southern District of Iowa.

the projects in the issue on the cover, was typical. *Woodsmith* was produced using a two-color photographic process. The magazine was bound by a protective cover, a common protection method. Each issue of *Woodsmith* was three-hole punched, making it suitable for placement in binders.

Since 1984, Meredith has published *Wood* magazine, another bimonthly woodworking magazine. Through market research, Meredith developed *Weekend Woodworking Projects* (*Projects*), a magazine focusing on small-scale, easy-to-do woodworking plans. Meredith planned to publish *Projects* on alternative months to *Wood*. In 1987, Meredith decided to market *Projects* by distributing a subscription solicitation mailer developed by a free lance copywriter. Previously, Woodsmith had hired the same free lance copywriter to create a unique direct mail package, including a subscription solicitation mailer.

Woodsmith solicited subscribers to *Woodsmith* through use of the *Woodsmith* mailer.[2] In July, September and October 1987, Meredith distributed thousands of *Projects* mailers. Shortly thereafter, Woodsmith received several inquiries from

its subscribers regarding Meredith's *Projects*.[3] Woodsmith claims to have lost 55,028 potential *Woodsmith* subscribers during the period from June 1987 through October 1988 due to the distribution of the *Projects* mailer.

Woodsmith filed suit seeking damages and injunctive relief, alleging trade dress infringement in violation of section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a) (1946).[4] Woodsmith asserted that Meredith's *Projects* had assumed *Woodsmith*'s trade dress. Woodsmith also alleged that Meredith had engaged in unfair competition by using a subscription solicitation confusingly similar to the *Woodsmith* mailer, resulting in confusion among potential subscribers regarding the origin of *Projects* and the *Projects* mailer. On June 27, 1989, the district court granted Meredith's motion for summary judgment on the ground that, based upon the record and the trial court's visual inspection of the magazines and the mailers, no genuine issue of material fact existed regarding likelihood of confusion, an essential element of a trade dress infringement claim under sec-

---

2. Because Woodsmith spent in excess of $3,000,-000 developing an effective advertising scheme, Woodsmith asserts a "trade dress in the making" theory specifically rejected by this court in *Black & Decker Mfg. Co. v. Ever-Ready Appliance Mfg. Co.*, 684 F.2d 546, 550 (8th Cir.1982). Under this rejected theory, trade dress is protectable due to "substantial advertising outlay and marketing approach used ... to promote the product." *Id.*

3. The record on appeal consists of a Joint Appendix (hereinafter designated J.A.) and an Exhibit Appendix (hereinafter designated E.A.). Specifically, the evidence indicated that on October 26, 1987, a subscriber inquired about *Projects* while ordering a woodworking pattern from Woodsmith. J.A. at 129. On November 19, 1987, another subscriber wrote to Woodsmith to question the price differential between *Woodsmith* and *Projects*. E.A. at 446. On November 23, 1987, a *Woodsmith* subscriber attempted to subscribe to *Projects* by mailing the bill from *Projects* to Woodsmith in a *Woodsmith* prepaid envelope. E.A. at 473. On December 28, 1987, a subscriber wrote to Woodsmith in a *Woodsmith* envelope to complain that he had not received his first issue of *Projects*. J.A. at 131. On February 25, 1988, Meredith received a letter indicating confusion as to the source of the *Projects* subscription mailer because of its

similarity to the *Woodsmith* advertising mailer. E.A. at 6. On February 29, 1988, a subscription was sent to Woodsmith accompanied by a check made payable to *Projects*. E.A. at 463. One subscriber indicated she thought she had received the *Projects* mailer from Woodsmith. E.A. at 460–61. Both Woodsmith and Meredith are located in Des Moines, Iowa. Therefore, harmless confusion by the inattentive could be expected.

4. Section 43(a) of the Lanham Trademark Act provides in pertinent part that:

Any person who shall ... use in connection with any goods or services, ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of original ... or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

tion 43(a). Woodsmith appeals from the judgment entered upon grant of summary judgment. We affirm.

## II.

 Woodsmith contends that summary judgment should not have been granted because the trial court was confronted with conflicting evidence of actual confusion and likelihood of confusion,[5] resulting from Meredith's publication of *Projects* and distribution of a direct mail subscription solicitation mailer which allegedly misappropriated the trade dress of *Woodsmith* and the *Woodsmith* mailer.

In reviewing a district court's grant of summary judgment, this court applies the same standard as the district court and views the facts in the light most favorable to the nonmovant, giving it the benefit of all reasonable inferences to be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Continental Grain Co. v. Frank Seitzinger Storage*, 837 F.2d 836, 838 (8th Cir.1988). A moving party is "entitled to judgment as a matter of law" if the nonmoving party

fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof. *Id.* 477 U.S. at 323, 106 S.Ct. at 2552; *Johnson v. Schopf*, 669 F.Supp. 291, 295 (D.Minn. 1987). However, summary judgment should not be granted if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

 Summary judgment correctly results from the application of substantive law to facts established beyond reasonable controversy. In unfair competition cases, the dispute between the parties usually "centers on the interpretation to be given to the facts—not the facts themselves or the inferences that can be drawn from the facts." Burton, D., "Summary Judgment in Trademark Cases," 75 Trademarks Rptr. 497, 498–99 (1985). Summary judgment disposition is proper in such an instance.

## III.

 Section 43(a) creates a federal cause of action for trade dress infringement. The trade dress of a product is the total image of a product, the overall impression created, not the individual features. *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir.1987). Protectable trade dress carries a three prong burden of proof for Woodsmith's claim: it must be primarily nonfunctional;[6] have acquired a secondary meaning (i.e., that the public has come to recognize the trade dress as associated with the plaintiff's product); and imitation of it would create a likelihood of confusion in consumers' minds as to the origin or source of the product.[7]

---

5. Proof of actual confusion is necessary for an award of damages. In order to obtain injunctive relief, proof of likelihood of confusion is required. *Co–Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1329–30 (8th Cir.1985).

6. The test for determining whether a trade dress feature is functional is whether protection of the feature would hinder competition or impinge upon the rights of others to compete effectively in the sale of goods. *Hartford House, Ltd. v. Hallmark Cards, Incorporated*, 846 F.2d 1268,

1272 (10th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988).

7. The district court found genuine issues of material fact regarding functionality and secondary meaning. The district court noted that "[a]lthough it clearly appears from the discovery record that each feature of *Woodsmith* is functional, the whole collection of features in combination could be found by a reasonable jury to be nonfunctional." Rulings and Orders of Dismissal, No. 87–723–B at 3 (June 27, 1989). The district court further stated that "[a]lthough

*Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc.,* 821 F.2d 800, 803–04 (D.C. Cir.1987); *Prufrock, Ltd., Inc. v. Lasater,* 781 F.2d 129, 132 (8th Cir.1986); *Truck Equip. Servs. Co. v. Fruehauf Corp.,* 536 F.2d 1210 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). Every product has a different threshold for confusion of origin. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482 (1st Cir.1981).

In *Prufrock,* this court cautioned that a party cannot be deemed to have a business interest capable of protection in the mere method and style of doing business. Protection of a marketing approach under section 43(a) would be inconsistent with the goals of our free enterprise system. *Prufrock,* 781 F.2d at 132 (citing *Denton v. Mr. Swiss of Missouri, Inc.,* 564 F.2d 236 (8th Cir.1977)). In the instant case, Woodsmith alleges that Meredith appropriated the trade dress of *Woodsmith* and the *Woodsmith* mailer. However, the features of *Woodsmith* and the *Woodsmith* mailer that Woodsmith considers unique are functional and in common use in the magazine industry.

■■■ Each issue of *Projects* was three-hole punched. This format facilitated the collection of issues and storage in binders for future reference. Both magazines have twenty-four pages in each issue. Length is merely an indication of an efficient market approach to publication. *Projects* and *Woodsmith* are not printed on the same color paper. Two-color photographic processing is a common publication technique because it is less expensive. Because brown is the color of wood, it cannot be monopolized by one woodworking magazine publisher. The protective covers of the two magazines are not identical in appearance and serve the same functional purpose. The computer-enhanced two-color separation process employed by Meredith was commercially available and resulted in a superior product. Meredith's decision to publish bimonthly was economically based. The type styles utilized by *Projects* and *Woodsmith* were not unique. *Woodsmith's* use of easy-to-follow instructions to present material is commonplace in the instructive magazine market. Meredith's assertion that projects were built and tested in the shop amounts to an express warranty and not trade infringement. Inclusion of a materials list and cutting diagrams is standard for how-to publications. Almost all magazines of this type use detailed photographs and illustrations. Blow-ups and exploded views are not unique methods of presenting information. The use of brown three-ring binders does not constitute trade dress. The artwork in *Projects* (i.e., hard line ink drawings with a sans serif type face in tan shaded boxes) is admittedly employed in *Woodsmith* as well as other woodworking magazines, and therefore not immediately distinguishable as *Woodsmith* artwork. Both *Projects* and *Woodsmith* exhibited classic magazine cover designs, masthead and banner title across the top and use of a block or framed photograph. The functional format (i.e., columns of text) of a magazine does not constitute protectable trade dress. Many magazines sell back issues making the service far from unique.

Likelihood of confusion is a material fact, an essential element of a trade dress infringement claim under section 43(a). The documentary evidence indicated that when *Woodsmith* subscribers responded to an editorial in issue No. 54 of *Woodsmith,* they demonstrated no likelihood of confusion.

One subscriber stated that though both *Projects* and *Woodsmith* targeted a different but related clientele,

> until you mentioned the similar format I made no connection between the two publications.

E.A. at 439. Another *Woodsmith* subscriber indicated that he

> wasn't in the least confused by the advertising [the *Projects* mailer].... [I]t was clear to me that it was sponsored by *Wood,* and that it was different from *Woodsmith.* If I hadn't been convinced by the advertising, I certainly was by the

the question is very close, I believe that a reasonable jury could also find from the record

that the *Woodsmith* trade dress carries a secondary meaning, albeit weak." *Id.*

new magazine itself. It is clearly not a Woodsmith product.... I don't believe that you need to worry about their competition.

E.A. at 440. A third subscriber wrote that: [w]hen *Wood* magazine came out with their *Weekend Woodworking Projects* a few months ago, I ordered a subscription from them; I've enjoyed their magazines as much as yours and was not in the least "confused" by their title and format. Frankly, I can't understand how anyone intelligent enough to publish and understand a magazine of *Woodsmith*'s caliber could be confused.

E.A. at 441. An additional subscriber explained that he

subscribed to 'Weekend Projects' not because I thought it was a 'Woodsmith' publication but because it was published on months alternate to those of 'Woodsmith.'

E.A. at 443. Yet another subscriber wrote to Woodsmith that he

also received their advertisement discribing [sic] their product. At no time did I make a connection with your publication.... If some of your readers have been confused ... I'm sure it can be attributed to their own lack of attention to detail.

E.A. at 445. The subscriber informed Woodsmith that

[y]our publication is by far a superior product. I have subscribed to 'Weekend Woodworking Projects,' ... I was not impressed with the first issue ... projects are unchallenging, the price is much too high, and the narrative is dry and impersonal.

*Id.*

Among potential subscribers the differences in the magazines were more important than the similarities. Therefore, likelihood of confusion did not exist.

■ In Lanham Act cases, survey evidence is often introduced on the issue of likelihood of confusion when a party seeks summary judgment.[8] No survey was presented by Woodsmith in the instant case. In *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22 (1st Cir.1989), the First Circuit recognized that surveys are a valuable method of demonstrating actual confusion. However, surveys are not required to prove likelihood of confusion. *Id.* at 31; *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1086 (7th Cir.1988). Though surveys are probably the most accurate evidence of actual confusion necessary for the award of damages, in *International Kennel Club* the Seventh Circuit held that the absence of a consumer survey was not *per se* fatal to a request for preliminary injunction where likelihood of confusion was the issue, since the plaintiff's burden was slight at that stage of the proceedings. As a result, the court declined to mandate that a survey be offered. *International Kennel Club*, 846 F.2d at 1086.

■ Woodsmith offered evidence of a few instances of actual confusion among subscribers.[9] Though evidence of actual confusion may be the best evidence of likelihood of confusion, it is not conclusive of its existence. *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 668–69 (8th Cir.1987). Therefore, a court may find such evidence insufficient to establish the existence of a genuine issue of material fact regarding likelihood of confusion. Meredith produced sufficient evidence in response, providing reasonable explanation and serving to discount for these isolated instances of confusion.

■ Visual inspection is permissible as an aid to a district court's determination of likelihood of confusion, but should not constitute the sole basis for the conclusions made. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, 504 (8th Cir.1987) (preliminary injunction

---

8. *See, e.g., Rogers v. Grimaldi*, 875 F.2d 994, 1001 (2d Cir.1989); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 869 (2d Cir.1986); *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 116 (2d Cir.1984).

9. *See supra* note 3.

**1250**

case). The parties have provided photographs and original facsimiles of *Woodsmith* (R. at 773–868), *Projects* (R. at 511–772), the *Woodsmith* mailer (R. at 121–32) and the *Projects* mailer (R. at 425–38). As a result, this court is as adequately equipped as the district court and empowered to determine whether an issue of material fact existed regarding the likelihood of confusion due to the similarity of the products. *See Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*, 618 F.2d 950, 954 n. 6 (2d Cir.1980).

We find that the district court properly concluded that the evidence of actual confusion presented was insufficient as a matter of law. Under the circumstances, we believe no reasonable trier of fact could find likelihood of confusion.

### CONCLUSION

We conclude that the district court correctly found, based on the evidence presented, that no genuine issue of material fact existed regarding likelihood of confusion. No reasonable jury could have returned a verdict for Woodsmith. Meredith was entitled to judgment as a matter of law. Therefore, we uphold the district court's grant of summary judgment in favor of Meredith dismissing Woodsmith's complaint.